HENRY P. KLEIN *et al.* Appellants, *vs.* THE INDEPENDENT BREWING ASSOCIATION *et al.* Appellees.

*Opinion filed December 17, 1907—Rehearing denied Feb. 6, 1908.*

1. APPEALS AND ERRORS—*when a franchise is not involved.* A proceeding by a minority stockholder against the corporation and its directors which is not brought under section 25 of the general Incorporation act, and in which no dissolution of the corporation is sought by the bill nor ordered by the decree, does not involve a franchise.

2. SAME—*when a freehold is not involved.* A freehold is not involved in a proceeding by a minority stockholder against the corporation and its directors to compel the latter to account for alleged misuse of the corporate funds in purchasing, from themselves, real estate at an excessive value, where the relief prayed and decreed is that such directors be required to take back the property at its real value and refund the excess to the corporation, or, if they refuse to do so, that the same be sold and the proceeds credited upon their liability.

3. SAME—*when decree is final and appealable.* A decree in a proceeding against a corporation and certain directors which finds the latter guilty of fraud in purchasing real estate from themselves at excessive values and of doing other acts complained of in the bill, and which appoints a receiver, is final and appealable, notwithstanding the cause is referred to a master to state the account between the parties upon the basis fixed by the decree.

4. CORPORATIONS—*when the purchase of property should be reported to the directors.* Where the executive officers of a corporation are authorized, by general resolution, to purchase real estate for the corporation from time to time, if such officers purchase property from themselves at high valuations, good faith requires that they inform the directors of the transactions and not leave them to discover the facts from the record.

5. SAME—*directors of a corporation will not be permitted to profit by their own wrongdoing.*  Although certain of the directors of a corporation are authorized, by general resolution, to buy real estate for the legitimate business of the corporation, yet if such directors sell their own property to the corporation a court of equity will closely scrutinize the transaction, and will not permit them to profit by the transaction as individuals to the injury of the corporation.

6. SAME—*when stockholder must be held to have ratified purchase of land by directors.*  If a stockholder and director of a corporation, after obtaining knowledge that certain real estate has been purchased by other directors for the corporation, assists in encumbering such real estate for money with which to buy other property, he will be. deemed to have ratified the original purchase so far as the real estate so encumbered is concerned.

7. SAME—*when directors' acts are not ratified by stockholders.*  Directors of a corporation owning and controlling a majority of its stock cannot defeat the right of a minority stockholder to an accounting by causing their unlawful acts to be ratified at a stockholders' meeting which they control as effectually as they control the board of directors; and the rule is not changed by the fact that the loss falls most heavily upon them as stockholders, where such loss is more than offset by their gain as individuals.

8. SAME—*when a stockholder is estopped to ask accounting for salaries paid to officers.*  A stockholder who, as a director of the corporation, participates, year after year, in the election of the same persons as officers and in the fixing of their salaries, is estopped to ask an accounting for such salaries, even though on one occasion the directors illegally increased the salaries of officers nearly at the close of the year and made the increase retroactive.

9. SAME—*complainant must prove allegation that directors did not pay interest on loans to themselves.*  A stockholder who alleges in his bill that certain directors of the corporation have borrowed money from the corporation upon which they have paid no interest has the burden of proving such allegation; and if he has participated in the custom with the others, the fact that one of them has become a bankrupt and is unable to pay back the principal of his loan does not entitle such stockholder to any relief.

10. SAME—*when receiver should not be appointed.*  Upon a bill by a stockholder against a corporation and certain of its officers to compel the latter to account for profits made by them as individuals in selling real estate to the corporation at fraudulently excessive values, if there is no allegation that the corporation is insolvent nor any prayer for a dissolution, and the evidence shows the corporation is prosperous and solvent and that there are no grounds

for a dissolution, the court should not appoint a receiver pending the accounting.

11. SAME—*rule of accounting where officers of corporation buy their own lands for corporation.* In requiring officers of a corporation to account for profits made in selling their own real estate to the corporation at excessive prices, if the property has been of substantial value to the business of the corporation the court should charge them with the price paid, but they should not be charged with interest, except as to the fraudulent excess, nor with the cost of improvements which have enabled the corporation to increase its business and profits; and they should be given the privilege of taking the real estate back upon payment of the amount charged against them.

APPEAL from the Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. JOSEPH E. GARY, Judge, presiding.

This was a bill filed by appellant Henry P. Klein against the Independent Brewing Association, a corporation, and certain persons as stockholders and officers of said corporation. The following statement made by the Appellate Court sufficiently shows the material charges of the bill and the relief prayed, also the substance of the answers to the bill and the decree of the superior court:

"Henry P. Klein, a stockholder and also a director in the Independent Brewing Association, on October 23, 1905, filed his bill of complaint against the company and several of its officers, past and present, and one Conrad Furst, a stockholder, and prayed *inter alia* for the following relief: That a receiver be appointed, with the usual powers of receivers, to take possession of, hold and dispose of all the books and properties, equitable interests and things in action of said Independent Brewing Association under the order of the court, and that the real estate purchased, as charged in the bill, from the defendants Leo Ernst and Otto Ernst, Jr., may be re-conveyed, under the direction of the court, to said Leo Ernst, and the said defendants, except such brewing association and said Conrad Furst, and each of them, be re-

quired to account for and pay into the said brewing associa-
tion such moneys as may be found due and owing to such
association from the defendants on account of such real es-
tate transactions, over and above the amount or amounts
which may be realized from the sale thereof, under the
direction of the court, and that in the meantime the three
Ernsts, Leo, Otto and Emil, be restrained from conveying,
transferring, concealing or encumbering any of the assets
of said brewing association, including the real estate pur-
chased from Leo and Otto Ernst, until the further order of
the court, and for general relief. An engrossed amended bill
was filed after the hearing, by leave of court, April 13, 1906,
and the answers filed were allowed to stand as answers to
the engrossed amended bill. On November 22, 1905, an
order was entered allowing Adam Frederick, Edward C.
Knuth, John Busch, A. Rohn and Philip May to intervene,
and on March 9, 1906, John Busch withdrew and the cause
was dismissed as to him.

"The pleadings and the proofs are voluminous. We
shall therefore confine our statement and review to such
limited portions, only, which we deem necessary to a de-
cision of the case and a clear understanding of the issues
involved.

"The Independent Brewing Association was incorporated
under the laws of this State February 24, 1890, with a capi-
tal stock of $500,000, divided into 5000 shares with a par
value of $100 each, for the manufacture and sale of beer,
with its brewery established in the city of Chicago.  Henry
P. Klein was the originator of the brewery association and
a director from the start, and at the time of filing the bill
owned 1135 shares of its stock. * * * September, 1896,
the three Ernsts and one F. W. Boldenweck purchased a
majority of the stock and went into the active and control-
ling management of the brewery; that the Ernsts owned
between them 2430 shares and F. W. Boldenweck 280
shares; that William Boldenweck afterwards acquired the

latter 280 shares; that Conrad Furst subsequently secured from the Ernsts 2400 shares; that while Conrad Furst is the actual owner of the shares last mentioned, there is some agreement or understanding said to exist by which the Ernsts have the right of re-purchase. The officers of the association are Leo Ernst, president, Leo E. Ernst, secretary, and Emil Ernst, treasurer, and the directors are the three Ernsts, the complainant Henry P. Klein, and his son, Joseph Klein.

"It is charged that 'on or about the 11th day of September, A. D. 1896, the said Emil Ernst, said Otto Ernst, said Leo Ernst and said F. W. Boldenweck fraudulently and unlawfully entered into a conspiracy together for the purpose of wrongfully and fraudulently depriving your orator and other stockholders of such corporation other than said Ernsts, said Furst and Boldenweck, of their rights and interests as such stockholders, and of fraudulently and unlawfully exploiting said corporation and converting its funds and assets for the benefit of said Emil Ernst, said Leo Ernst, said F. W. Boldenweck and said Otto Ernst; that on or about the 12th day of February, 1903, said Conrad Furst acquired nominal title to about 2400 shares of the capital stock of said corporation from said Emil Ernst and said Leo Ernst; that the said Conrad Furst has never, in person, actively participated in the affairs of said corporation, either as stockholder or otherwise, but, on the contrary, the stock of Conrad Furst has always been represented and voted by said Leo Ernst and said Emil Ernst; that in pursuit of said conspiracy said Emil Ernst, said Leo Ernst, said F. W. Boldenweck and Otto Ernst have from time to time heretofore, since September 11, 1896, unlawfully and fraudulently caused and permitted large sums of money to be paid out of the funds of such corporation to said Leo Ernst, said Emil Ernst, said Otto Ernst, said F. W. Boldenweck, said William Boldenweck, and each of them, and have purchased property with the funds of said corporation from

different ones of said defendants at fraudulently excessive prices, and have from time to time paid out large sums of money from the funds of said corporation to different ones of said defendants as pretended salaries to them, as officers of said corporation, in excess of the salaries to which said defendants were from time to time lawfully entitled under the by-laws and lawful resolutions of the directors of said corporation, and are now fraudulently and unlawfully paying to said Emil Ernst, Leo Ernst, Leo E. Ernst, out of the funds of said corporation, as pretended salaries to said last mentioned defendants for respective offices now held by them, as aforesaid, large sums of money, namely, $10,000 per annum, and are, and have been since the last mentioned date, continuously hitherto, arbitrarily, fraudulently and unlawfully manipulating the affairs, moneys and properties of said corporation for their own use and benefit, to the great injury of your orator in the premises.'

"The bill further charges that the Ernsts were owners of certain real estate in Chicago or controlled encumbrances thereon, which they caused to be conveyed to the association at excessive values; that to enable this to be carried out, on October 14, 1897, they caused a resolution to be passed at a meeting of the directors authorizing the purchase of real estate necessary for the business of the association; that the resolution was fraudulent; that several pieces of property were thus acquired by the association, among others, Lincoln Turner Hall; Glen Ellyn; 579 West Twenty-second street; 463-469 West Belmont avenue; 3452 North Clark street; 517 West Twenty-second street,—at a gross price of $122,200. All these properties were known as 'beer stands,' and secured for the asserted purpose of securing exclusive sales of the association beer thereon and keeping out all other brews. The title to these several properties was taken in the name of Otto Ernst, Jr., in trust for the association, and a declaration of such trust made and delivered by said Otto Ernst, Jr., to the associa-

tion, and was kept by it among its papers. It is again charged that the by-laws were so changed, as a part of the conspiracy, that the officers were voted large and excessive salaries, and that the Ernsts and F. W. Boldenweck borrowed money which they did not re-pay, either of principal or interest; that while large profits were made no dividends were declared or paid for two years.

"Appellants all answered, some separately and others jointly. Every act of fraud charged was explicitly and categorically denied, also the charges of conspiracy, that the real estate purchased by the corporation was either fraudulently or unlawfully acquired or that prices paid were excessive, and averring that all such property was acquired pursuant to a resolution of the board of directors and to meet the needs of the association's business and to promote its welfare; denied also that illegal or excessive salaries were paid or moneys unlawfully borrowed, or that the money so borrowed was not re-paid, with interest; denied all acts of misfeasance or illegal conduct charged or that any liability rests upon them to account as prayed. The answers affirmatively charge that Henry P. Klein had both actual and constructive notice of the acquisition by the association of all the real estate set out in the bill; that he was a stockholder and director from the organization of the association to the time of commencing the suit; that he had access to all the books and papers of the association at all times; that he was present at nearly all the meetings of the stockholders and the board of directors, and received $300 a year as salary as director although no provision therefor was made by the by-laws; that he either made or seconded the motion for the allowance of such annual salaries as were paid to the officers of the company three years prior to exhibiting his bill, and that in 1905 he voted for and assisted in the bonding of the association and the mortgaging of its brewery property and the Lincoln Turner Hall for $125,000, also for the purchase of the Rienzi property,

and then insists that he (Klein) is estopped and barred by *laches* and acquiescence from the relief prayed. It is alleged that the association is solvent and a going concern, and avers that Henry P. Klein endeavored to force Leo Ernst to buy his stock at $165 per share, and threatened if he did not accede to such request he (Klein) would have the association in the hands of a receiver within twenty-four hours.

"The decree finds the facts substantially as set up in the engrossed amended bill and appoints the Chicago Title and Trust Company receiver in bonds of $50,000, and directs it to take charge of the assets and effects of the association and proceed forthwith to carry on the business of the association until the further order of the court. The association and Leo Ernst and Emil Ernst are ordered to deliver to the receiver all books of account, securities and evidence of indebtedness and effects belonging to the association. The receiver is directed from time to time to make report of its actions and doings and be at liberty to apply to the court for further directions. The court reserved the question of the duration of the receivership and final disposition by the receiver of the property and effects coming into its hands as such receiver. The receiver was ordered to neither employ nor pay out any money to any of the parties to this suit without the express direction of the court. The decree then directed the cause to be referred to a master of the court to take an account between the association, the three Ernsts and F. W. Boldenweck, according to the findings in the decree, the proofs taken and the instructions of the court, and then proceeds to specifically direct the lines upon which the account shall be taken."

From the decree of the superior court defendants to the bill prosecuted an appeal to the Appellate Court for the First District. That court reversed the decree of the superior court and remanded the cause, with directions to dismiss the bill for want of equity as to all of the complain-

ants except Rohn and May, and that as to them the bill be dismissed without prejudice to their rights, if any they have. From the judgment of the Appellate Court complainants have prosecuted this appeal to this court.

JACOB J. KERN, and JOHN A. BROWN, for appellants.

LOESCH, SCOFIELD & LOESCH, JOSEPH H. MUHLKE, and FREDERICK Z. MARX, for appellees.

Mr. JUSTICE FARMER delivered the opinion of the court:

A motion was made in the Appellate Court by appellees there, who are appellants here, to dismiss the appeal for want of jurisdiction in that court to entertain it, and the denial of that motion by the Appellate Court is one of the errors assigned in this court.

The grounds of the motion to dismiss the appeal in the Appellate Court were, that a freehold and a franchise were involved and that the decree of the superior court was not a final judgment. The bill was not filed under section 25 of the act on corporations and did not pray a dissolution of the corporation, nor did the decree direct a dissolution. In such case no franchise is involved. (*Chicago Steel Works v. Illinois Steel Co.* 153 Ill. 9.) Neither is a freehold involved. The bill charged that the Ernsts had sold real estate to the corporation for more than its value and prayed that they be required to take the lands and make good the loss, and in the event of their refusing to take the land, that the title be confirmed in the corporation and sold and the proceeds credited upon the liability of the Ernsts. This is not putting in issue, by the pleadings, title to the lands. Nor is it a case where the necessary result of the decree is that one party gains and the other loses an estate in land. The effect of the allegations of the bill in this respect was to charge the Ernsts with the amount paid by the corporation for the real estate and repudiate their acts in purchas-

ing it.   If this were done and they paid to the corporation the amount it had paid for the real estate, they would, of course, be entitled to said real estate.   The decree directed that if they failed to accept the real estate and pay back the money the real estate be sold and the proceeds credited to the Ernsts on their liability for the purchase price.   In such case no freehold is involved.   *Nevitt* v. *Woodburn,* 175 Ill. 376; *Beach* v. *Peabody,* 188 id. 75.

The decree appealed from found the appellees guilty of fraud in purchasing the real estate, receiving the salaries and in doing the other acts complained of, substantially as set forth in the amended bill; appointed a receiver for the corporation and referred the cause to a master in chancery, with directions to take an account between the corporation and Otto, Leo and Emil Ernst and F. W. Boldenweck, appellees.   The decree ordered that the account be taken in accordance with the findings in the decree, the proofs taken and the instructions of the court, and specifically found appellees liable and fixed the basis upon which the account should be taken.   We are of opinion the decree was not interlocutory but a final one, from which an appeal lies. In *Allison* v. *Drake,* 145 Ill. 500, it was held that a decree setting aside a former decree in a partition suit and ordering a re-conveyance of the property and fixing the interests of the joint tenants, appointing commissioners to make partition and referring the cause to the master to take an account as to rents and profits, was final.   The court there said (p. 510) : "A final decree is not necessarily the last order in the case, as orders sometimes follow merely for the purpose of carrying out or executing the matters which the decree has determined, but when it finally fixes the rights of the parties it is final and may be reviewed on appeal or writ of error."   In *Stahl* v. *Stahl,* 220 Ill. 188, and *Gray* v. *Ames,* id. 251, will be found similar holdings of this court on the above question.   In the latter case the court say (p. 254) : "A decree is final even where, as a mere inci-

dent to the relief granted, it directs a reference to a master to state an account. Where accounts are to be settled between the parties and the decree contains an order of reference by which the accounts are to be stated according to certain principles fixed by the decree, such order of reference will not have the effect of rendering the decree interlocutory."

There was no error in the Appellate Court refusing to dismiss the appeal.

The property which the Ernsts are charged in the bill with having purchased for the corporation, and which they owned or had liens upon at the times the purchases were made, are known as Lincoln Turner Hall; the Glen Ellyn property; 3452 North Clark street; 579 West Twenty-second street; 463 West Belmont avenue, and 517 West Twenty-second street. The total price paid by the corporation was $122,200. The decree finds that Lincoln Turner Hall was purchased by the corporation in 1897; 463 West Belmont avenue, 3452 North Clark street and 517 West Twenty-second street in 1899; and 579 West Twenty-second street and the Glen Ellyn property in 1900. The value of the properties is found by the decree to be $72,625. By the decree the Ernsts are charged with all the moneys paid out on account of the purchase and improvement of the said properties, and interest thereon; also they and F. W. Boldenweck are charged with all moneys withdrawn from the corporation by them for their own personal use, with interest thereon, and with moneys paid out on account of salaries. The three Ernsts were authorized by the decree to take the properties at the values fixed therein, if they elected to do so, and in case of their failure to take the properties, that the same be sold and the proceeds credited upon their liability to the corporation. The Ernsts claim that the purchase of the properties for the corporation was authorized by the following resolution adopted at a meeting of the board of directors October 14, 1897:

"Whereas, it is therefore necessary to maintain and with the growth of the city increase its business, that this association should procure and purchase, from time to time, real estate necessary and suitable for saloons and locations for the purpose of regularly selling the beers manufactured by it; now therefore,

"*Be it resolved,* That the executive officers of this association are hereby authorized and empowered, from time to time, to purchase real estate which may be necessary for the association to own and control for the purpose of selling its manufactured beer in the city of Chicago.

"*Resolved, further,* That the title to such property be taken in the name of Otto Ernst, Jr., and that upon their conveyances being made to him he do execute and file with the secretary of this association a declaration of trust showing that he holds such property sold and furnished for this association.

"*Resolved, further,* That such purchase of said real estate shall be made from the surplus moneys of the association over and above ten per cent to be paid in dividends, on hand from time to time; that no debts shall be created for the purchase of such real estate, but encumbrances reasonable in amount may be assumed, if existing on such real estate so purchased or conveyed to or for the use of the said association.

"*Resolved, further,* That the officers are hereby authorized to take property necessary to the business of the association in payment of any debts that may be due this company."

These purchases appellees contend were made for the purpose of procuring places for the exclusive sale of their beer, thereby increasing and promoting the prosperity of the business the corporation was engaged in. The evidence shows that the purchasing of property for such purposes was engaged in by other breweries and was regarded as a profitable method of increasing the business of the brewery. All of the properties purchased were beer stands at the time of the purchase except the Glen Ellyn property. No beer appears to have been sold at that property until 1905. Acquiring real estate for such purposes was not *ultra vires*. (*Kraft* v. *West Side Brewery Co.* 219 Ill. 205.) Indeed, the purchases of the properties mentioned are not attacked on the ground that the corporation had no authority to buy them for the purposes for which they were bought. The grounds of the attack are that the Ernsts owned some of

the property and had an interest in some of the other properties, and on account of their owning and controlling a majority of the stock they exercised a controlling influence upon the board of directors and caused the properties to be purchased from themselves at a higher valuation than they were worth. At the time of the adoption of the resolution of October 14, 1897, the board of directors consisted of nine members, and Leo, Otto and Emil Ernst, and members of their families, constituted a majority of the board. Klein testified that he was present at the time that resolution was adopted, and voted for it, and that he supposed under the authority of said resolution the directors would purchase for the corporation good beer stands worth from $5000 to $10,000; that nothing was said at that time about the purchase of any particular property. He further testified that although he was continuously a director of the corporation and attended all the meetings, with few exceptions, no report was made to the board of the purchases of any of the properties, and that the first knowledge he received on that subject was in March, 1905, when he was given a list of the real estate owned by the corporation by some of the officers, to be used by him in assisting to procure a loan for the association.

It is insisted by appellees that on account of Klein's continuous membership in the board of directors and his attendance at all of its meetings, with few exceptions, he must have known of the purchases of these properties, the persons from whom purchased and the prices paid therefor. The evidence showed the management of the business and the purchase of properties was under the complete control of the Ernsts, who, by reason of holding a majority of the stock, were able to control the election of the board of directors. We find no evidence in the record of any actual knowledge of Klein of the purchase of the properties before mentioned, prior to the time he was given the list before referred to, in 1905.

It is insisted by appellees that the books and records of the corporation were accessible to Klein as well as to all other directors and stockholders, and an examination of them was never refused to any one by the directors and officers in charge; that whether Klein had actual knowledge of the purchases of the properties or not, the means of such knowledge were at all times accessible to him and the slightest inquiry would have revealed to him the facts.   Under these circumstances it is contended the means of knowledge are equivalent to knowledge itself, and that Klein is therefore barred by *laches* and acquiescence from maintaining his suit.   Mr. Jummel, the book-keeper of the corporation, who was also a stockholder and part of the time a director, testified that it was the custom of the board of directors to cause to be made at the end of each year an inventory of its assets and liabilities, and that this inventory contained a detailed statement of all the property of the corporation and its cost.   From this inventory an abstract or condensed statement was made, in which the value of the real estate was given but not its description.   This abstract was read at the stockholders' meetings instead of the inventory containing a more detailed statement.   He testified that if any stockholder had inquired for the items which made up the value of the real estate he would have shown them the inventory.   Klein testified these condensed statements were read to the stockholders by the president but were not shown to or examined by the board of directors; that before commencing this suit he asked the secretary, Mr. Boldenweck, for a copy of the statement made at the last meeting previous thereto and was told by the secretary he was too busy to give it to him; that later on he did get statements made at some of the meetings but had to make repeated requests before obtaining them, and that on one occasion when he asked for them Mr. Boldenweck told him that Leo Ernst, the president, was out of the city; that he could not furnish them without his consent, and promised to write the

president for his permission. Klein testified he told Boldenweck that if he did not furnish him the statement he would go to the books and examine them, and that Boldenweck told him he did not want him to do that.

We are impressed from the evidence that the superior court was warranted in finding the purchases of the properties complained of were not reported to the board of directors at the time they were made, nor afterwards. As the Ernsts owned or were interested in them before they were sold to the corporation, and as they were the active controlling agencies in making the purchases, good faith required that they should inform the board of directors of the transaction, and not leave it to the individual members of the board to discover the facts from an examination of the books and records of the corporation. While Klein was a stockholder and director he was himself engaged in other enterprises of his own and the management and conduct of the brewery were under control of the Ernsts.

Upon the subject of the value of the properties the evidence was conflicting, except as to the evidence of the Glen Ellyn property. Appellees' own evidence tends to prove that the price paid for 579 West Twenty-second street was from $1000 to $2700 more than it was worth; that the price paid for 3452 North Clark street was $2500 more than it was worth, and that the price paid for 517 West Twenty-second street was $1500 more than it was worth. The price paid for these properties and 463 West Belmont avenue was $37,200. The superior court found they were worth $20,625. If that finding was justified by the evidence it will be seen that the amount paid for those properties in excess of what they were really worth was $16,575. Appellants' evidence tended to show that the properties were worth less than the value found by the superior court.

In *Gilman, Clinton and Springfield Railroad Co.* v. *Kelly,* 77 Ill. 426, the rule was announced that the directors of a corporation were to be regarded as trustees for the

stockholders, and that it was unlawful for them to act in opposition to the interest of the stockholders or place themselves in a position where their individual interest would interfere with their acting for the best interest of all the stockholders, and it was said (p. 434): "The rule is the same that applies to all persons acting in any fiduciary capacity that requires the utmost fidelity to the interests of the *cestui que trust.* The rule, in its general sense, embraces every relation in which there may, by any possibility, arise a conflict between the duty to the person with whom the trustee is dealing or on whose account he is acting, and his own individual interest:"

In *Weidenger* v. *Spruance,* 101 Ill. 278, it was said that while the stockholders elect the directors to carry into effect the corporate functions, the directors cannot act unlawfully in the conduct of the business of the corporation without being made liable in a court of equity at the instance of a stockholder. In that case the court quoted with approval from Angell & Ames on Corporations: "The directors are the trustees or managing partners and the stockholders are the *cestuis que trust* and have a joint interest in all the property and effects of the corporation, and no injury that the stockholders may sustain by a fraudulent breach of trust can, upon the general principles of equity, be suffered to pass without a remedy." The same rules are announced in many subsequent cases and in all the text books we are familiar with on the subject of corporations.

While the management of the corporation was committed to the board of directors, which acts by a majority, and said board was authorized by the resolution of October 14, 1897, and by law, to purchase real estate to be used by it in furtherance of its legitimate business, the utmost good faith is required in all transactions, and where the directors are selling their own property to the corporation they control and manage, a court of equity will scrutinize the transaction very closely, and will not permit the direct-

231—39

ors to deal with themselves to their own advantage as individuals and to the injury of the corporation. The finding of the superior court that there was paid for the four pieces of property last above mentioned $16,575 more than their market value was sustained by competent evidence, and the fact that the testimony upon this subject was conflicting would not justify an appellate tribunal in reversing this finding unless it should appear that such finding is clearly and palpably contrary to the weight of the evidence. Such is not the case here.

Appellees insist that they acted in good faith in purchasing the property, and while they practically admit they may have paid something more than the market value for some of it, they claim it was worth to the corporation, for the purposes they bought it for, all that was paid for it. In *Higgins* v. *Lansingh*, 154 Ill. 301, after a review of cases relating to dealings of directors with the corporation, it was said (p. 367): "It was further said, that during the solvency of the corporation the directors are the agents or trustees of the stockholders; and in *Harts* v. *Brown*, 77 Ill. 226, it was said that a director, in so dealing, must act fairly and be free from all fraud and oppression, and must act for the interest of the company and impose no unfair or unreasonable terms. But it has not been held that the company or its stockholders may not avoid a contract requiring the action of the board of directors to make it, whether made in good faith or not, where so many of the directors are interested in the contract adversely to the company that the company is not represented by a disinterested majority of the directors voting. On the contrary, it is held that the directors, without the sanction of the stockholders, have no power to contract, for the corporation, with themselves or for the benefit of themselves, and if they attempt to do so the contract may be avoided by the corporation or its stockholders not consenting, whether the contract appears to be fair and just or not."

We do not think appellant Klein is barred from obtaining any relief as to the purchase of the four pieces of property mentioned, on account of *laches* and acquiescence. There is no evidence that he had any actual knowledge upon this subject until March, 1905.   It was then he was given a list of real estate owned by the corporation for the purpose of assisting in procuring a loan.   One of the purposes the loan was desired to be procured for, was to pay for a piece of property known as "The Rienzi," which had been contracted for, for $75,000.   Klein assisted in procuring a loan for $125,000, to secure which Lincoln Turner Hall and other property of the corporation, not including the four pieces above mentioned, was mortgaged.   He then knew of the purchase of that property, and by assisting to encumber it for money to buy other property he must be held to have acquiesced in and ratified the purchase by the board of directors.   We find no evidence in the record that the Glen Ellyn property was not worth the price paid for it.   As to those two pieces of property Klein was entitled to no relief.

It is further contended by appellees that the purchases of the real estate complained of in the bill were ratified at a special stockholders' meeting held November 28, 1905, and at the annual stockholders' meeting held January 17, 1906.   The record shows that at a special meeting of the stockholders held on November 28, 1905, 4536 shares were represented in person, 136 shares by proxy and 328 shares were not represented.   At that meeting Leo Ernst, the president, made a statement of the condition of the business and gave in detail the purchases of real estate made by the board of directors under the resolution of October 14, 1897.   Mr. Klein was present, and, after the statement made by Leo Ernst, addressed the stockholders, criticising and objecting to the action of the directors in purchasing the properties complained of.   After some further discussion a resolution was adopted ratifying, approving and confirming all pur-

chases of real estate theretofore made by the board of directors. This resolution was adopted by a vote of 3287 shares for to 1385 shares against it; 2410 shares voted for the resolution were voted by Conrad Furst, father-in-law of Leo Ernst, to whom the stock had been transferred by Leo and Emil Ernst under some agreement and arrangement by which they were to be permitted to re-purchase the stock; 1085 of the shares voted against the resolution were voted by Klein and members of his family. At the same stockholders' meeting one of appellees' counsel, controlling one share of stock, offered a resolution authorizing the board of directors to sell any real estate of the corporation not a part of the brewery plant, when in their judgment they deemed it for the best interest of the corporation. This resolution was amended by excepting from it the Rienzi property and 110 Sedgwick street. As amended it was adopted by the affirmative vote of 3447 shares, 1225 shares voting against it, and 1085 of the shares voted in the negative were voted by Klein and members of his family. Of the shares voted for the resolution ratifying and confirming the purchases, Leo Ernst voted 361; Emil Ernst 240; Leo E. Ernst, son of Emil Ernst, 10; Conrad Furst, father-in-law of Leo Ernst, 2410; P. Jummel, the book-keeper, 30, and F. W. Boldenweck, 1. The same parties voted the same number of shares for the adoption of the resolution authorizing the sale of the real estate by the directors. At the annual stockholders' meeting January 17, 1906, the record shows there were represented in person 4486 shares of the capital stock, 477 by proxy and 37 shares were not represented. The chairman of the meeting read the annual statement of the condition of the corporation at the close of business December 31, 1905. Conrad Furst moved that the statement be accepted as read. This motion was seconded by a stockholder named Thielen, and the minutes show the motion was carried. The vote on the motion is not shown. Leo Ernst then offered a resolution

authorizing the board of directors to sell real estate of the corporation not a part of the brewery plant, which is almost identical with the resolution on the same subject adopted at the special stockholders' meeting November 28, 1905. The minutes show this resolution was adopted but do not show the vote.

We do not think these acts at the stockholders' meetings can be held to have been a ratification of the action of the directors in purchasing the property. Both these meetings were held after this suit was instituted. Leo Ernst, Emil Ernst and Conrad Furst controlled a majority of the stock, and at the special stockholders' meeting on November 28, 1905, cast all the votes in favor of the resolutions that were then adopted except 276 shares. Some of these 276 shares were voted by persons related to the Ernsts or closely connected with them in business. While Conrad Furst bought 2400 shares of stock from Leo and Emil Ernst in February, 1902, as we have before stated, there was an agreement between them by which the Ernsts were to be allowed to re-purchase the stock, and Furst never attended either a stockholders' or a directors' meeting prior to the filing of the bill in this case. His stock before the commencement of this suit was represented in stockholders' meetings by proxies given by him to Leo or Emil Ernst, or both of them, and it is apparent it was as. much subject to their control as if they had owned it absolutely, and for the purposes of this case must be considered as belonging to them. It is not to be tolerated that the directors of a corporation owning and controlling a majority of its stock shall be permitted to cause their unlawful acts to be ratified by calling a stockholders' meeting which they control as effectually as they do the board of directors, and causing a majority of the stock to be voted in favor of the ratification. If the acts complained of were unaffected by any unlawful and fraudulent motive and conduct, and it were a question simply whether the directors had exercised good judgment

for the best interests of the corporation, a different rule would perhaps apply, for the directors and a majority of the stockholders have the right to control, direct and manage the corporation. In this case, however, the directors purchased from themselves property for an amount much in excess of its value, and this was a fraud upon the stockholders which could not be ratified or condoned by a stockholders' meeting at which a majority of the votes cast in favor of the ratification were cast by or under the control of the directors who were guilty of the wrongdoing. If the reverse were true, then the minority stockholders would be at the mercy of the majority, who would be able to elect the directors and control stockholders' meetings and thereby ratify the acts of the directors, however wrongful and injurious they might be to the corporation. The situation is not changed by the fact that the Ernsts owned or were interested in and controlled the majority of the stock, and anything that injuriously affected the success and prosperity of the business fell most heavily upon them, for what they lost as stockholders in buying property from themselves at an excessive profit they gained as individuals, while the stockholders who had no interest in the property purchased, shared the loss with all the other stockholders and received none of the benefits and profits that accrued to the Ernsts as individuals. In such case the innocent stockholder has a remedy in equity for an accounting. *Chicago Hansom Cab Co.* v. *Yerkes*, 141 Ill. 320; *Higgins* v. *Lansingh, supra; Bixler* v. *Summerfield,* 195 Ill. 147; *Atwood* v. *Merryweather,* L. R. 5 Eq. Cas. 464; *Miner* v. *Belle Isle Ice Co.* 93 Mich. 97.

Prior to a meeting of the board of directors held November 12, 1896, the by-laws provided that no officer of the association should receive a salary in excess of $3000 per annum. The minutes of the meeting of the board of directors held on that date show that Otto Ernst moved to amend the by-laws by providing that the salaries should be

fixed, from time to time, by the board of directors. This motion was adopted, and thereupon the secretary moved that the salary of the president for the remainder of that year, and of the vice-president and treasurer, be fixed at $500 per month and the salary of the secretary at $150 per month. The brewmaster's salary was, on motion, fixed at $150 per month. Mr. Klein was present at this meeting. The minutes show the motion fixing the salaries was unanimously adopted, though Mr. Klein says he voted against it. At a directors' meeting held November, 1901, at which eight directors were present, among them appellant H. P. Klein and his son, Joseph H. P. Klein, a motion was adopted that directors not in the employ of the corporation be paid $300 for the year 1901: At the same meeting a motion was adopted that the president and the vice-president be paid $7500 for that year. On that proposition Klein is recorded as voting no. At the meeting of the directors on February 13, 1902, Leo Ernst was elected president, Emil Ernst vice-president and treasurer, and Fred W. Boldenweck secretary. Mr. Klein was present and seconded the motion to elect Leo Ernst president and made the motion to elect Boldenweck secretary of the corporation. After the election of officers, on motion of Fred W. Boldenweck, seconded by Jummel, the salary of Leo Ernst as president and of Emil Ernst as vice-president and treasurer was fixed at $10,000 each for the ensuing year. The board of directors consisted of nine members. Eight were present. H. P. Klein and his son, Joseph H. P. Klein, voted against the motion, the other six directors present voting for it. At this same meeting the salary of Boldenweck was fixed at $4000 for the year 1902, and the salary of directors not in the employ of the corporation was fixed at $300 for that year. How Mr. Klein voted on fixing these salaries is not shown by the minutes. Leo Ernst testified the reason for increasing Boldenweck's salary to $4000 was, that previous to that time another man, Arthur Ernst, had performed the

duties of brewmaster; that he had retired, and after that time Boldenweck, in addition to his duties as secretary, also performed the duties of brewmaster.    At the directors' meeting January 15, 1903, Leo Ernst was elected president, C. Emil Ernst vice-president and treasurer, and Fred W. Boldenweck secretary of the corporation.    Appellant H. P. Klein was present at the meeting, seconded the motion to elect Leo Ernst president and made the motion to elect Boldenweck secretary.    Boldenweck then moved that the officers and directors be paid the same salaries they had been paid the previous year.    This motion was seconded by Klein and appears to have been unanimously adopted. The officers of the corporation for 1904 were elected at a meeting of the board of directors held March 10 of that year.    Previous to this time the number of directors had been reduced to five.    Emil Ernst, Henry P. Klein and Fred W. Boldenweck, directors, were present at the meeting.    Leo Ernst and Joseph H. P. Klein, the other directors, were absent.    On motion of Boldenweck, seconded by Klein, Leo Ernst was elected president, and on motion of Klein, Boldenweck was elected secretary.    On motion of Boldenweck, seconded by Klein, it was ordered that the officers and directors be paid the same amount for salaries for the ensuing year that they had been paid the previous year.    At the directors' meeting February 9, 1905, all directors were present except Fred W. Boldenweck.    In his absence Joseph H. P. Klein acted as secretary of the meeting.    Upon motion of appellant H. P. Klein the same persons were re-elected president, vice-president and treasurer, and secretary, and on his motion it was ordered that they be paid the same salaries for that year that they had been paid the past year.    Mr. Klein gives no reasonable explanation for his long silence upon this subject with full knowledge of all the facts.    By his conduct subsequent to the meeting of November, 1901, in participating in the election and re-election of the same officers year after year and fixing

their salaries, including a salary to himself, as director, of $300 per year, he is estopped from now asking an accounting on account of the salaries paid after said year 1901. (*Brown* v. *DeYoung,* 167 Ill. 549; *Rosehill Cemetery Co.* v. *Dempster,* 223 id. 567; Cook on Corporations, sec. 646.) Furthermore, there is not a word of proof that the services of the officers of the corportion were nòt worth the salaries paid to them. They were experienced men in the brewery business, and Leo Ernst had received from another brewery a salary of $14,000 per year before he became connected with the Independent Brewing Association.

The increase in the salaries of the president and vice-president and treasurer in 1901 was not made until November of that year, but the resolution fixing the salaries applied to the whole year and not merely to the remainder of it. It was not legal for the directors, almost at the close of the year, to increase the salaries and make such increase retroactive. (*Cheeney* v. *Lafayette, Bloomington and Mississippi Railway Co.* 68 Ill. 570; *Ellis* v. *Ward,* 137 id. 509; *Rosehill Cemetery Co.* v. *Dempster,* 223 id. 567.) We are of opinion, however, that appellant Klein, by reason of his subsequent participation in the directors' meetings and his long delay in attacking the action of the directors in fixing back salaries for 1901, must be held to be estopped from now questioning that transaction.

Originally only 4000 of the 5000 shares of capital stock authorized were issued, and 370 of these shares were issued to and owned by Klein. Subsequently 200 shares were issued to and taken by a man named Stadler. In 1903 the remaining 800 shares of authorized capital stock were issued, and most of it was issued to parties who were then stockholders at par. Klein got 200 shares of this issue. From September, 1896, to February 6, 1904, the corporation paid to its stockholders, in dividends, $250,720. This was not equal to ten per cent of the par value of the stock issued at the time dividends were paid each year, of which fact Klein

complains.   No dividends at all were paid in 1899 and 1902. In 1896, 1897 and 1898 the dividends paid were ten per cent of the par value of, the capital stock then issued.   In 1900 two dividends of six per cent each were paid;  1901 a six per cent dividend;  1903 three per cent, and 1904 eight per cent.   The proof also shows that the real value of the plant and property of the corporation greatly increased during those years.   It would seem Klein was reasonably well satisfied with the success of the enterprise and his investment in it, for he increased his holdings from 370 shares in 1901 to 1073 shares in 1905.   In addition to paying $100 a share for the 200 shares of the last issue of stock, he paid Stadler $120 a share for 200 shares and other parties $150 per share for 90 shares.   Klein testified he did not know what the value of the stock was at the time of the trial,—that it was probably worth $90 per share.   After the controversy arose between him and the Ernsts there were some negotiations between them for the sale of his stock to the Ernsts.   He asked $165 per share.   He says the Ernsts said they did not have the money then but that they would buy it if they could and sell it in four months and get his money out of it, but he refused to put his stock in escrow unless the Ernsts would advance him $10,000, which they refused to do and the sale was not consummated.   Klein further testified he knew parties who sold their stock in 1905 for $225 per share, less six per cent commissions. Leo Ernst testified that at the time he became connected with the Independent Brewing Association the book value of the property of the corporation was $560,000, or about $140 per share;  that the book value at the time of the trial was $1,000,000, or $200 per share, and that this was net value, exclusive of liabilities.   These conditions of the business of the corporation, the values of its stock and the increased purchases thereof by Mr. Klein from 1901 to 1905, together with the part taken by him in the election of officers and fixing their salaries, are not in harmony with

his present claim of dissatisfaction on account of the salaries paid to the officers.

The evidence showed that the Ernsts, and Klein also, borrowed considerable sums of money from the corporation. All these loans have been paid back to the corporation, but Klein contends the Ernsts did not pay interest on their loans. That they did pay interest is shown by the testimony. Whether they paid a reasonable rate upon all their loans does not appear from the evidence. The burden was upon Klein to prove the allegations of his bill that they had not paid the interest. Having failed to do so, the decree should not have found the Ernsts liable upon this account. Boldenweck appears to have owed the corporation $2000 for borrowed money, which has not been paid. He testified he had been adjudged a brankrupt and discharged by the court. Upon the subject of the Ernsts' liability on account of money borrowed from the corporation, we agree with the Appellate Court. That court said: "The Ernsts borrowed money from the brewery and so did Klein. The evidence shows that the Ernsts paid back all the principal of the loan and some interest,—how much does not appear. The burden certainly rested upon Klein to substantiate his charge in relation to interest, and as he has made no attempt to do so his complaint is unavailing. F. W. Boldenweck became a bankrupt. Whatever money he borrowed from the association and did not re-pay is on a par with the borrowing by the Ernsts and Klein. The Ernsts are no more liable for Boldenweck's indebtedness than Klein would be for the Ernsts if they had not paid. The sums were all loaned with the knowledge and implied assent of Klein, and upon the principles herein laid down he is estopped to dispute the transaction."

We are of opinion, also, that the court erred in the appointment of a receiver for the corporation. We have before stated the bill was not filed under section 25 of chapter 32, Hurd's Statutes of 1905. The bill did not allege

that the corporation was insolvent, or that it had done any of the things which would authorize a dissolution of it by the court and the appointment of a receiver to wind up its affairs under said section 25. Neither does the bill pray for nor the decree order a dissolution of the corporation. It was a going concern and the evidence abundantly shows that it was solvent. If, as contended by counsel for appellants, a court of equity may, under its general chancery powers, at the instance of a stockholder, appoint a receiver for the preservation of the property pending an accounting by the officers of a corporation for fraudulent misuse or conversion of its funds, the evidence shows that this is not a case where the exercise of such power was warranted. In *First Nat. Bank* v. *Gage,* 79 Ill. 207, it was said: "A receiver should be appointed in no case unless it is made to appear there is an imperative necessity for the step, to preserve some particular property for such parties as shall be entitled to the benefit." The Independent Brewing Association was a prosperous, solvent, going concern, and the evidence does not show that it was necessary for the preservation of the rights of appellants that it should be taken from the control of its officers, who had managed it successfully for many years, notwithstanding their wrongful conduct in the purchase of certain property. 23 Am. & Eng. Ency. of Law, (2d ed.) 1023; 10 Cyc. 989-991.

We are of opinion Leo, Emil and Otto Ernst should not be charged with interest on the full amount of the purchase price paid for the properties, but should be charged with interest only on the amount they paid in excess of the market value of the property. Nor should they be held liable for the cost of improvements made upon said properties after the purchase. The proof shows these properties were advantageous to the business of the corporation, and, in addition to rents received therefrom, by reason of owning and controlling them it was enabled to and did sell large quantities of its product, thereby materially increas-

ing its business and profits. The Ernsts should be charged with $37,200, the total amount paid for the four pieces of property particularly described in the bill and known as 463-469 West Belmont avenue, 3452 North Clark street, 517 West Twenty-second street and 579 West Twenty-second street, and with interest at five per cent on the amount the court found they paid for each of said properties in excess of its value from the date of its purchase. They should be given the option, as was done by the decree of the superior court, within a time fixed upon, for the payment into the treasury of the corporation of $37,200, plus interest at five per cent on $16,575, and in the event of such payment the president and secretary of the corporation should be ordered and directed to execute and deliver to said Leo, Otto and Emil Ernst a good and sufficient deed conveying to them said premises. In the event of the said Ernsts refusing to take said properties and make said payments, the properties should be directed to be sold by the master in chancery to the highest and best bidder for cash, and the proceeds, after paying costs and expenses, be credited upon the amount found due from the said Ernsts to the corporation and paid by the master to the treasurer of the said corporation. If the proceeds of the sale, after paying the necessary costs and expenses, should be insufficient to pay the same, the master should report that fact to the court for such further order of the court as may be proper to be made in such case. There is no necessity for referring the cause to a master for taking an account.

The judgment of the Appellate Court and the decree of the superior court are reversed and the cause remanded to the superior court, with directions to enter a decree in accordance with the views herein expressed.

*Reversed and remanded, with directions.*