ANNA KOSTER MELISH, Ex'rx of the Estate of Frank Koster, Plaintiff-Appellee, Cross-Appellant, *v.* HILMOND O. VOGEL *et al.*, Defendants-Appellants, Cross-Appellees.

First District (2nd Division) No. 57838

Opinion filed December 23, 1975.—Rehearing denied January 29, 1976.

128

Morgan, Lanoff, Cook & Madigan, of Chicago (Samuel M. Lanoff, John A. Cook, and James E. McParland, of counsel), for appellants.

George B. Collins and Richard T. Wimmer, both of Collins & Amos, of Chicago, for appellee.

Mr. JUSTICE STAMOS delivered the opinion of the court:

Plaintiff, Anna Koster Melish, executrix of the estate of Frank Koster, filed a nine-count complaint in the circuit court of Cook County against defendants, Hilmond O. Vogel, Vogel Tool & Die Corporation, Edward Coulon, Harry May, and George Pickard. Subsequently, Hilmond O. Vogel and Vogel Tool & Die Corporation filed a third-party complaint against Edward Melish and Anna Koster Melish.

The cause was referred to a master in chancery who, after hearing witnesses and receiving numerous exhibits, entered a final report. The circuit court, after receiving objections to the master's report from both plaintiff and defendants, entered a final decree, from which defendants appeal and plaintiff cross-appeals.

This case was before the master for over four years. During that time, he conducted 33 hearings, heard 13 witnesses covering over 1500 pages of transcript, and considered almost 200 exhibits. His final report exceeds 50 pages. Due to the complex nature of the issues raised and the voluminous record presented, we will refer to the evidence only to the extent necessary and then only as it refers to the issue being considered.

■■ Plaintiff's complaint was in nine counts. For various reasons, Counts III, VII, VIII, and IX are not before us. Each of the remaining counts and the third-party complaint will be considered separately. However, one preliminary comment is in order. All the evidence in this case was presented to the master. Based on that evidence and on his determination of the credibility of the witnesses, the master made certain findings

of fact and conclusions of law. The trial court, based on the objections of the respective parties to the master's report, but without the benefit of hearing the witnesses, rejected several of the master's findings. Both parties now raise the question of what weight is to be given to the master's report under such circumstances. The apportioning of weight between the master's report and the chancellor's final decree has posed no small problem for courts of review. However, in *Uksas v. Zelensky*, 21 Ill.2d 303, 172 N.E.2d 359, the Supreme Court set forth the different rules and explained their interrelationships.

> "While it is generally agreed that where the chancellor has heard the evidence his findings will not be disturbed unless they are clearly and manifestly against the weight of the evidence [citations] where, however, as in the instant case, the master alone heard the evidence and the chancellor adjudicated the cause on the 'frozen record,' there is no such unanimity of expression in the case law. Under these circumstances, some decisions have applied the manifest weight rule if the chancellor approves the findings of the master [citations]; while others insist that all the facts are open for consideration on review, particularly if the chancellor rejects the master's findings. [Citations.] These decisions reiterate the rule that the master's report, while *prima facie* correct, is of an advisory nature, and that all the facts in a chancery case are open for consideration in the first instance by the trial court, and, in case of an appeal, by the reviewing court, where the ultimate question is, 'Was the decree rendered by the court a proper one under the law and the evidence?'" (21 Ill.2d 303, 310-11.)

The court went on to state that where the chancellor had no better opportunity to judge the credibility of witnesses than the court on appeal, it was the reviewing court's duty to make its own independent determination of the facts, giving due consideration to the findings of the master who heard and saw the witnesses. Thus, with the rule set forth in *Uksas* in mind, we have made our own independent determination of the record before us. *Galler v. Galler*, 61 Ill.2d 464, 336 N.E.2d 886.

## A.

In Count I of plaintiff's complaint, plaintiff alleged that her late husband, Frank Koster, invented a device or apparatus known as a "Mitre-Snug." Plaintiff further alleged that the patent for the Mitre-Snug was assigned to defendant corporation because defendants May and

Coulon falsely and fraudulently claimed to be the inventors thereof. Plaintiff claimed that defendant corporation holds said patent as constructive trustee for the estate of Frank Koster and asked for an accounting of the profits derived from the patent and for other relief. Both sides presented testimonial and documentary evidence. The master found that although the oral evidence presented by both sides would make the issue a stand-off, the documentary evidence produced by defendants was more persuasive. The master concluded that plaintiff failed to prove her case by a preponderance of the evidence. The trial court, although not having heard the witnesses, rejected the master's findings and granted plaintiff the requested relief. A summary of the evidence follows:

Julius Vogel, father of defendant Hilmond Vogel, was the sole proprietor of a tool company that eventually became defendant corporation. He invented a device known as an Arc-Fit. It is unnecessary to describe in detail how the Arc-Fit worked. Suffice it to say that it was a device that allowed steel tubing to be joined without the aid of couplers. Frank Koster joined defendant corporation, becoming a partner and the general manager. While with the corporation, he invented two devices, the Arc-Twin and the Arc-Snug. Both operated on the same basic principle as the Arc-Fit, but both clearly improved on the Arc-Fit principle. Frank Koster died on June 8, 1958. The patent for the Mitre-Snug, the device in question, was issued on January 22, 1963. Suffice it to say that although the Mitre-Snug is similar to the Arc-Snug, it is inventively different and clearly an improvement over the Arc-Snug. To establish that Frank Koster had also invented the Mitre-Snug before his death, plaintiff and two other witnesses testified.

Donald Kerr, a former employee of the corporation, stated that he first saw the Mitre-Snug in operation in 1957 and that Frank Koster worked on the basic development of this type of punch and die assembly. However, in several instances, when pressed by the master as to whether he actually saw Koster working on the Mitre-Snug, the witness replied, "I assume he did." The witness was shown an order for tubing from the Checker Cab Company taken during Koster's lifetime and stated that the order called for the type of work the Mitre-Snug could have easily accomplished. However, on cross-examination, the witness admitted that the order could also have been filled by other methods. The witness further testified that several other persons besides Frank Koster also worked on the Mitre-Snug, and several times, his best recollection of who had actually worked on a particular problem was "we all" did.

Harry Hayward, another former employee of the corporation also

testified for plaintiff. As a machinist for the corporation, Hayward remembered working with Frank Koster on the development of the Mitre-Snug early in 1958. He built more than one Mitre-Snug during Koster's lifetime and ran off sample parts with those units while Koster was alive. It was Hayward's opinion that certain notations on the Checker Cab Company order as to price indicate that the order was filled using the Mitre-Snug rather than any other production method. However, Hayward later testified that while employed by defendant, he was not involved in calculating the prices on the work done. Hayward stated that Frank Koster began referring to an apparatus called a Mitre-Snug about a year before he died.

Anna Koster Melish testified that she heard the word "Mitre-Snug" about a month or so before her husband died. She further testified that on the Friday before her husband's death, Koster, while sketching on a pad of paper, snapped his fingers and said, "This is it, now I've got it. This is the Mitre-Snug." He went on to explain that it worked similarly to the Arc-Snug, but a little differently.

Defendant Vogel testified that he acted as the patent attorney for the corporation. He stated that he received information concerning the Arc-Snug from Frank Koster, but information concerning the Mitre-Snug came from Edward Coulon. He denied ever having received any information concerning the Mitre-Snug from Koster and produced drawings, dated January 22, 1959, which he said were used in the patent application. He testified that Coulon was the first person to ever show him the apparatus. However, he admitted that he did not know how long before January 1959 that the Mitre-Snug was operational. In fact, it was possible that, unknown to him, it was in existence before Frank Koster died. He further admitted that it was within Koster's mental capacity to invent a device such as the Mitre-Snug.

Defendant Edward Coulon testified that he is now the general manager of defendant corporation, Koster's former position. He has 30 years experience as a tool designer, experimental engineer, tool room foreman, and assistant chief engineer and assistant to the vice-president of other companies. He produced documents, dated October 27, 1958, which he stated represented the first development of what came to be the Mitre-Snug. He claimed that he invented the Mitre-Snug, although he was aided by the ideas of others, including Harry May. He had never seen any other drawings of the Mitre-Snug, nor did he have knowledge of any discussions by any other persons concerning a similar product. He has seen no evidence on any company documents that indicate Hayward or Kerr ever worked on a similar product. He has not found

anything in the company records to indicate that Frank Koster ever gave any time or attention to the question of making a mitre-cut for tubing.

The final witness for defendants as to Count I was Harry May, another employee of the corporation. Although not a registered engineer, he is a tool and die designer and has been employed by defendant corporation since 1954. He prepared the first drawings of the Mitre-Snug, dated October 27, 1958, after discussions with Edward Coulon. He had never seen a product such as the Mitre-Snug prior to that date, nor had he received any information regarding the development of that product from Frank Koster. He admitted that it was possible, although not probable, that Koster had tools made and operating before June 1958 of which he was not aware.

As to the documentary evidence, there was much discussion of the Checker Cab Company order. Plaintiff contends that certain notations on the order, which was filled during Koster's life, indicated that the Mitre-Snug had been used to fill the order. Defendants, on the other hand, introduced drawings that indicated that a punch and die totally different from the Mitre-Snug had been used to fill that order.

The evidence thus presented consisted of testimonial and documentary evidence. The testimonial evidence was, as the master noted, at best a stand-off. Kerr and Hayward, both of whom had worked with Frank Koster, testified that the Mitre-Snug was in operation before Koster's death and that Koster had helped develop the apparatus. However, when pressed, Kerr's testimony became less than persuasive, and neither could point to any job order or situation which would explain their allegedly accurate recall of events occurring ten years earlier. Moreover, their testimony is internally inconsistent with that of Anna Koster Melish. Kerr and Hayward testified that they had used the Mitre-Snug in conjunction with Frank Koster as early as 1957. However, Anna Melish testified that it was not until the Friday before he died in June 1958 that Frank Koster perfected the idea.

Balanced against plaintiff's evidence is the consistent testimony of Coulon and May that they were the ones to develop the Mitre-Snug. While Coulon and May had a possible interest or bias in the outcome of the litigation, that fact was before the master.

Finally, there is the added fact of the documentary evidence. A review of all the evidence demonstrates that plaintiff's reliance on the Checker Cab Company order to prove the existence of the Mitre-Snug was misplaced. For while that order could have been filled using the Mitre-Snug, it also could have been filled through various other methods.

Defendants introduced further documentary evidence that indicated, because of its cross-numbering and dating, that the Mitre-Snug was

developed by Coulon and May after Koster's death. Again, the possibility that these documents were "manufactured" by defendant corporation for use during this litigation was a fact no doubt considered by the master.

■■■ In short, this was a case, at best, of evenly balanced conflicting evidence. In such cases, the opportunity to observe the witnesses and their demeanor while testifying becomes crucial to deciding questions of fact. That determination is peculiarly appropriate to the master who saw the witnesses. (*Stanley J. Gottschalk Construction Co. v. Carlson*, 253 Ill.App. 520.) All of the witnesses in this case were testifying to events that occurred ten years earlier. Both the trial court and this court have but the cold and unresponsive record upon which to determine the reliability of the various witnesses. As such, the master was better able than the trial court, or we, to give credit accordingly. After a review of the complete record, we cannot disagree with the master who found that plaintiff had not proven her case by a preponderance of the evidence.

Accordingly, that portion of the circuit court's order finding for plaintiff as to Count I is reversed and the cause remanded with directions to enter judgment for defendants as to Count I.

## B.

In Count II of her complaint, plaintiff alleged that at the time of Frank Koster's death, Koster and defendant Vogel each owned equal amounts of the stock of the corporation. Plaintiff alleged that there was a fiduciary relationship between Frank Koster, during his lifetime, and defendant Vogel; that the fiduciary duty owed to Frank Koster during his lifetime was owed to plaintiff after Koster's death; and that when Vogel later acquired control of the corporation through the purchase of stock from certain minority shareholders, Vogel breached this fiduciary duty owed to plaintiff. While unclear from the pleadings, plaintiff also apparently argued that the purchase of the minority stock was a corporate opportunity that Vogel wrongfully appropriated for himself.[1]

The master found that Vogel had not breached a fiduciary duty owed to plaintiff based either on his status as a controlling party in the corporation, or on his close relationship with plaintiff's husband. The trial court, without hearing any witnesses, rejected the master's findings and granted the requested relief. A summary of the evidence follows:

---

[1] There is another argument made by plaintiff, although not specifically set out in any count, that Vogel misused corporate assets (specifically corporate money paid to attorney Shipman under an allegedly void retainer agreement) to help acquire the minority shares. While this argument permeates both Counts II and VI, it will be considered along with Count VI in Part D.

When the Vogel Tool & Die Corporation was formed in 1946, Vogel and Koster had been equal partners in a predecessor business, Vogel Tool Works. Koster managed the actual running of the business and Vogel took care of all legal matters. In 1946, the business needed additional funds. Consequently, defendant Vogel retained attorney David Shipman to form a corporation and raise additional capital. The additional funds came from a small group of Shipman's personal friends. Vogel and Koster each received 40% of the stock with the remaining 20% apportioned among the new shareholders. Koster served as general manager of the corporation and Vogel was its president.

During Koster's lifetime, he and Vogel remained good friends and cooperative business associates. Although they often discussed together buying out the minority shareholders, they never actually made any offers. Besides serving as legal counsel for the corporation, Vogel was the first attorney plaintiff saw after her husband's death. Vogel took Frank Koster's will to attorney Robert Gorman, a friend of Vogel's, who eventually represented the Koster estate.[2] In short, during Koster's lifetime, he relied on Vogel for legal advice and Vogel relied on Koster to manage the business.

Frank Koster died in June 1958. Later that year, Edward Melish, apparently on behalf of plaintiff, began an "investigation" of the corporation's affairs. During the course of this "investigation," Melish entered the corporate plant several different times after it had closed for the night. Melish admitted going through the waste paper baskets during these visits. Vogel objected to these late night visits and changed the locks to the building several different times late in 1958 and early 1959. In January 1959, plaintiff married Edward Melish.

Some time early in 1959, plaintiff retained attorney Albert Sheppard as her representative for corporate affairs. In May 1959, plaintiff sued Vogel in an effort to avoid her late husband's testamentary trust. In June 1959, plaintiff appointed Melish proxy for her shares in the corporation. Also that month, plaintiff requested an opportunity to go over the corporate books and records.

In July 1959, Vogel completed his efforts to acquire the minority stock.

In August 1959, plaintiff was represented at defendant's annual shareholders' meeting by another attorney, Peter Chamales, and by Melish as her proxy. Also that month, plaintiff engaged a certified public ac-

---

[2] However, Vogel's "steering" of plaintiff to Gorman is somewhat offset by the fact that Koster, in his will, specifically asked for Gorman to represent the estate.

countant to go over the corporation's books. The instant lawsuit was filed in August 1960.

To establish Vogel's breach of a fiduciary duty, plaintiff relies on two alternate theories. Plaintiff first argues that Vogel, as a controlling party in the affairs of the corporation, owed a fiduciary duty to plaintiff.

■■ It is true that the directors and majority shareholders of a corporation are trustees of the business and property of the corporation for the collective body of stockholders. As such, they cannot in their dealings with the business or property of the trust use their relation to the corporation for their own personal gain. (*Dixmoor Golf Club, Inc. v. Evans*, 325 Ill. 612, 156 N.E. 785.) However, this is not a case where a director or majority stockholder took advantage of his position and converted a corporate asset or opportunity to his own use to the detriment of the corporation.

Plaintiff's cases are simply inapposite. Vogel did not sell corporate assets to the pecuniary detriment of the minority shareholders. (*Robb v. Eastgate Hotel, Inc.*, 347 Ill.App. 261, 106 N.E.2d 848.) He did not secretly purchase the corporate building with the help of corporate money. (*Bakalis v. Bressler*, 1 Ill.2d 72, 115 N.E.2d 323.) Nor did he sell his own property to the corporation at an inflated price. *Klein v. Independent Brewing Ass'n*, 231 Ill. 594, 83 N.E. 434.

■■ Rather, the availability of the minority stock was not a corporate asset or opportunity. The fact that Vogel was president of the corporation does not, by itself, create a fiduciary relationship as to his individual purchase of minority stock. (*Bawden v. Taylor*, 254 Ill. 464, 98 N.E. 941.) Directors of a corporation may purchase the stock of shareholders of the corporation on the same terms and as freely as they might purchase from a stranger. *Hooker v. Midland Steel Co.*, 215 Ill. 444, 74 N.E. 445; *Chatz v. Midco Oil Corp.* (7th Cir. 1945), 152 F.2d 153.

■■ While such a purchase may be set aside if the director or shareholder fraudulently misleads the other party by withholding material information (*Illinois Rockford Corp. v. Kulp*, 41 Ill.2d 215, 242 N.E.2d 228; *Wood v. MacLean Drug Co.*, 266 Ill.App. 5), there is no indication in the instant record of any such deception. Vogel was able to purchase the minority stock because he aggressively sought to purchase it and had the means to finance the purchase. His status as president and director of the corporation did not give him any special or secret information that aided his acquisition of the stock. On the facts presented, Vogel owed no fiduciary duty, based on his controlling position in the affairs of the corporation, to plaintiff as regards the purchase of the minority stock.

Alternatively, plaintiff argues that Vogel owed her a fiduciary duty based on the alleged fiduciary relationship Vogel owed to her husband during his lifetime. Plaintiff contends that this duty survived Koster's death and continued as to her until Vogel finally admitted acquiring the minority stock.

We find it unnecessary to determine whether a fiduciary relationship existed between Vogel and Koster. For even assuming that such a duty existed during Koster's lifetime, the record amply supports the master's finding that at the time that Vogel purchased the minority stock, the relationship between plaintiff and Vogel had deteriorated to the point where there was a mutual feeling of hostility between them. Any trust plaintiff reposed in Vogel did not long survive her husband's death.

Frank Koster died in June 1958. By the end of that year, Edward Melish was already making his late night visits to the corporate plant, apparently in search of fiscal irregularity. As a result, Vogel changed the corporation's locks several times. Although it would serve no useful purpose to set them out, the record also contains evidence of several verbal confrontations between Vogel and Melish which may or may not have ended with threats being exchanged between the two men. In May 1959, plaintiff had retained counsel and sued Vogel over the related matters of the trust Koster's will had established and a stock agreement that had existed between Vogel and Koster. Plaintiff then appointed Melish to represent her regarding the corporate affairs and gave him her proxy for the stock held by the estate. Sometime that year, plaintiff also engaged attorney Chamales who eventually represented her at the annual stockholders' meeting. Although it is unclear when and for what reason, plaintiff also hired an attorney named Spensely. It was in July 1959 that Vogel completed his acquisition of the minority stock.

■■ A fiduciary or confidential relationship exists where, by reason of friendship, agency, or business association and experience, trust and confidence are reposed by one person in another who, as a result, gains an influence and superiority over him. (*McCartney v. McCartney*, 8 Ill.2d 494, 134 N.E.2d 789.) The origin of the confidence is immaterial. It may be moral, social, domestic, or purely personal. (*Pfaff v. Petrie*, 396 Ill. 44, 71 N.E.2d 345.) Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly serviant party entrusted the handling of her business and financial affairs to the other and reposed faith and confidence in him. *Cunningham v. Cunningham*, 20 Ill.2d 500, 170 N.E.2d 547.

In the instant case, the record discloses at most only one instance in which plaintiff reposed trust or confidence in Vogel: when plaintiff re-

tained attorney Gorman, admittedly a friend of Vogel, to represent the Koster estate. For shortly thereafter, Melish began his late night visits to the plant. From that point onward, the relationship between the parties steadily deteriorated to the point where Melish described their relationship as a "feud." There were "discussions" or "quarrels," depending on which witness was testifying, locks were changed, and lawsuits filed. The record discloses nothing which indicates that plaintiff entrusted the handling of her business and financial affairs to Vogel. Quite the contrary, there was clearly a mutual feeling of hostility and mistrust between the parties. Excluding attorney Gorman, at one time or another, plaintiff had three other attorneys representing her in her various affairs. Melish was simultaneously conducting an "investigation" of the corporate affairs and serving as her proxy.

Plaintiff did not entrust the handling of her affairs to Vogel. (*McCartney v. McCartney.*) She did not act in all her business affairs under his advice and direction. (*Lipscomb v. Allen,* 298 Ill. 537, 132 N.E. 206.) Nor did she forsake independent counsel on her business matters. *Schmidt v. Landfield,* 23 Ill.App.2d 55, 161 N.E.2d 702, *aff'd,* 20 Ill.2d 89, 169 N.E.2d 229.

Proof of a fiduciary relationship must be so clear and convincing, strong, unequivocal and unmistaking as to lead to but one conclusion. (*Perry v. Wyeth,* 25 Ill.2d 250, 184 N.E.2d 861.) We can only conclude that on the basis of this record, there was a total lack of any such proof.

Accordingly, that portion of the circuit court's order finding for plaintiff as to Count II is reversed and the cause remanded with directions to enter judgment for defendants as to Count II.

## C.

Counts IV and V, both very similar, are involved in the cross-appeal by plaintiff. In Count IV, plaintiff alleged that the Vogel Tool Works, predecessor to defendant corporation, was a partnership in which Julius Vogel, father of defendant, owned a 49% interest and Leonard Beutler owned a 51% interest. Plaintiff further alleged: that Beutler sold his entire interest in the partnership to Koster and that Vogel acquired his father's interest in the partnership; that Vogel knew Koster purchased a 51% interest in the partnership but never so informed Koster; that Koster reposed complete trust and confidence in Vogel in all legal matters affecting the business; that because Vogel controlled all legal matters, he was able to keep Koster from ever discovering that Koster had originally purchased a 51% interest in Vogel Tool Works; that despite Koster's controlling interest, Vogel arranged the business so that Vogel and Koster operated first as equal partners and later as equal sharehold-

ers. Plaintiff concluded that Vogel defrauded Koster out of a 1% controlling interest in defendant corporation and asked that she be awarded a sufficient number of shares to control the corporation. Count V contained allegations similar to those in Count IV but referred to certain patents and a licensing agreement originally owned by Vogel Tool Works that Vogel allegedly defrauded from Koster.

The master concluded that all the evidence indicated that Koster accepted the fact that he and Vogel were equal partners in the partnership. He could find no indication that Koster ever objected to that arrangement. He also noted that Vogel contributed other consideration in addition to his 49% interest when the partnership was formed. He concluded that the evidence did not substantiate plaintiff's claim. In any event, he also concluded that Counts IV and V were barred by the parol evidence rule and by laches. The trial court confirmed the master's findings and plaintiff appeals. A summary of the evidence follows:

Vogel Tool Works, predecessor to defendant corporation was a partnership owned by Julius Vogel, father of defendant Vogel, and Leonard Beutler. Julius Vogel owned 49% of the business and Beutler 51%. After Julius Vogel died, his interest in the partnership eventually passed to defendant Vogel. On September 22, 1945, Beutler and Frank Koster entered into a written agreement in which Beutler agreed to sell his interest in Vogel Tool Works to Koster. Nowhere in that document is it stated that Beutler was selling 51% of the business. Instead, the agreement recited that Beutler was selling "all of his right, title and interest" in the business. However, the agreement did state that Koster desires "to become an equal partner in the ownership and management [of the business] with Hilmond O. Vogel."

On that same day, Koster and Vogel also entered into a written agreement. Although that document also stated that Koster and Vogel desired to be "equal partners" in Vogel Tool Works, and to that end each would contribute his respective interest in the old firm to the new partnership, it did not state that Koster was contributing 51% of the old business. Instead, it recited that Koster would purchase "all" of Beutler's interest and would contribute that interest to the new firm. However, that document contained several additional provisions. Vogel promised to advance Koster $1000 which Koster would use as a downpayment to Beutler for the purchase of Beutler's interest. Vogel also promised to contribute $500 to enhance the working capital of the new firm. In return, Koster promised to give Vogel a promissory note for $750.

Based on that agreement, Koster and Vogel operated as equal partners for approximately one year. In December 1946, in order to raise new

capital, defendant corporation was formed. Vogel and Koster received an equal number of shares in the new corporation, with a smaller number being issued to others to raise the needed capital. They continued that relationship until Koster's death in 1958. There is no evidence that Koster ever complained about the division of the businesses. Nor did Koster ever claim a greater interest in the original partnership or a greater number of shares in defendant corporation.

There is no dispute that Koster contributed a greater interest in the old partnership than Vogel did when the new partnership was formed. However, there is no evidence that Koster did so unwillingly or unknowingly. Plaintiff's evidence consisted only of an inference to be drawn from the fact that there is no document signed by Koster evidencing the fact that he owned and contributed a 51% interest in the old partnership. Plaintiff argues that since there is no affirmative evidence that Koster knew he owned 51% of the old partnership, Vogel must have kept that fact from him. Plaintiff has pointed to no additional evidence. to support this inference.

Rather, plaintiff claims that Vogel owed Koster a fiduciary duty and then relies on the presumption that transactions with a fiduciary are fraudulent and will be stricken unless the dominant party explains his conduct and accounts for the benefit. *Shlensky v. South Parkway Building Corp.*, 19 Ill.2d 268, 166 N.E.2d 793.

■■ However, plaintiff completely overlooks the fact that it was Vogel who lent Koster the money to buy his interest in the partnership. The Beutler-Koster agreement called for a downpayment of $1000, and that is exactly what Vogel agreed to lend Koster. Thus, the record presents a situation where Vogel, a lawyer but not a tool and die maker, inherited a part interest in a tool and die company and needed someone to run the business. Koster, an experienced tool and die maker, saw an opportunity to become an independent businessman but needed financing. The resulting equal partnership was exactly what each man desired. If Vogel only wanted to gain controlling interest in the business, as plaintiff suggests, this record presents no reason why he could not have purchased Beutler's interest himself. Why loan the money to Koster and end up with 50% of the business when he could end up with 100% of the business? The answer is simple: each needed the other for different reasons.

At the time of trial, Koster was dead. The best evidence of whether he knowingly relinquished his controlling interest in the partnership was therefore unavailable. Plaintiff relied entirely on an inference to be drawn from the absence of such a recital in two documents. Defendant's

explanation of the events was reasonable and, in a sense, borne out by the subsequent 12 years of successful business cooperation. The master and trial court both found that defendant Vogel had reasonably explained the forming of an equal partnership. We cannot say that such a determination was in any respect erroneous. Due to this determination, we do not reach the questions presented by the parol evidence rule or laches.

Accordingly, for the reasons given, those portions of the circuit court's order finding for defendants as to Counts IV and V are affirmed.

## D.

In Count VI, plaintiff alleged that corporate money was paid to attorney David Shipman under a retainer agreement entered into by Shipman and Vogel. Plaintiff alleged that the retainer agreement was entered into in violation of the corporate by-laws and that Vogel had no authority to bind the corporation. Plaintiff requested that Vogel be ordered to repay to the corporation all money paid out under the retainer agreement.

As noted in Part II, we will, at this time, also consider plaintiff's argument that Vogel used the retainer agreement to help acquire the minority stock. In this regard, plaintiff's theory is that the misuse of corporate assets was a breach of the fiduciary duty Vogel owed to the corporation. Since corporate money was allegedly used to acquire the minority stock, plaintiff requests that the corporation be declared the owner of the stock.[3]

The master found that Vogel did misapply corporate funds when he allowed the corporation to pay Shipman under the retainer agreement and consequently, recommended that Vogel be ordered to reimburse the corporation for the money so expended. However, while the master found that a "substantial" portion of the consideration for the agreement were services Shipman rendered to Vogel personally, he also found that Shipman did render services to the corporation. The master concluded that Vogel should be given the opportunity to prove up the details of the services rendered to the corporation and should be given credit for the reasonable value of such services. As for plaintiff's theory that Vogel

---

[3] We are compelled to note that although this theory was extensively argued both before the master and in this court, no count of plaintiff's complaint specifically sets forth such a cause of action. Being most liberal, the best that can be said is that this theory is a combination of Counts II and VI. However, mindful of the fact that this is a complex case and was before the master for over four years, we will treat the complaint, taken as a whole, as stating such a theory. We note that defendants have responded to this issue and have never questioned the propriety of plaintiff's theory.

acquired the minority stock "because of" the retainer agreement, the master found that although Shipman did help Vogel in the "mechanics" of acquiring the stock, he was not the cause of Vogel's success. Relying on his earlier finding that the corporate money was used only to obtain legal services, the master separated the wrong of misusing corporate money from the alleged wrongful acquisition of the stock and allowed Vogel to retain the stock.

The trial court agreed with the master that Vogel had misused corporate funds, but its decree made no provision for a setoff of the reasonable value of the services Shipman rendered to the corporation. As for the acquisition of the minority shares, the trial court found that the retainer agreement was entered into specifically for the acquisition by Vogel of the controlling shares, and thus, corporate money was used to obtain control of the corporation. Based on this causal relationship, the trial court decreed that the minority stock was to be returned to the corporation. A summary of the evidence follows:

At Koster's death, Koster and Vogel each owned 455 shares of the common stock of defendant corporation. There were 1000 common shares and 160 preferred shares outstanding at that time. The only stockholders not associated with the business were a group of investors originally brought into the corporation at its inception by attorney David Shipman. Their relevant holdings were as follows: 60 common shares by Dorothy Shipman, David Shipman's wife; 30 preferred shares by Ada Annes; 30 preferred shares by Janet Epstein; and 30 preferred shares by two corporate trustees (banks) for the children of Robert Biggert.

Although certain corporate provisions were designed to guarantee preferred dividends and a royalty pool in which all shareholders would participate, dividends were seldom paid and royalty payments were delayed. Consequently, for Shipman's group of investors, the stock was not as attractive an investment as originally anticipated. Moreover, due to certain personality conflicts within the business, Shipman felt that he had been "side tracked" in the corporation despite having organized it. He was disappointed that he had not been permitted to take a more active role in the running of the corporation.

When Frank Koster died, the corporation lost both its general manager and its most experienced and capable tool and die designer. There was some testimony that within days after Koster's death, some of the Shipman investors began discussing among themselves the possibility of selling their stock. Other testimony placed these initial discussions a month later, after the next shareholders' meeting. On June 24, 1958, Biggert, whose children owned 30 shares of stock, wrote Shipman expressing the feeling that "the company may be profitable only for the

officers" and suggesting that the minority shareholders "come to a definite understanding." These and other discussions culminated in late 1958 with the minority shareholders informally agreeing on a price of $6500 for each of the four blocks of stock, with Vogel always assumed to be the most likely purchaser. Although Vogel was informed of the substance of these discussions, a formal offer of sale was never presented to Vogel.

While these initial discussions among the minority shareholders continued, Edward Melish began taking an active interest in the running of the business. His suspicions that plaintiff was not being treated fairly by Vogel led to after hour visits to the plant and a substantial amount of animosity between the Melishes and Vogel.

In March 1959, Vogel telephoned Shipman and expressed a concern that plaintiff was about to discharge attorney Gorman, a friend of Vogel's, as attorney for the estate. Vogel asked to meet with Shipman and Paul Annes, husband of another member of the Shipman group.

In May 1959, plaintiff filed an action for declaratory judgment against Vogel in order to avoid the trust established by her husband and personally obtain the stock of defendant corporation.

The possibility of Edward Melish acquiring direct control of the Koster stock increased Vogel's concern regarding Melish's earlier disruptive actions. In that event, Vogel would find himself an equal partner with someone he could not get along with. On May 18, 1959, Vogel wrote Shipman a letter asking Shipman to represent him in the declaratory judgment action. He added "I would expect to be billed like any other client."

Shipman met with Vogel on May 21, 1959 and explained that due to his part in bringing in the other shareholders, he could not represent Vogel. Vogel then asked if Shipman would represent the corporation. Shipman agreed, but because of his earlier treatment by the corporation, he would require a substantial retainer on a long term basis. A minimum figure of $3000 per year was discussed, but Shipman felt he should contact the minority shareholders to get their permission for him to represent the corporation before continuing the discussions. On May 22, 1959, Paul Annes stated that neither he nor the Epsteins would have any objection to Shipman representing either Vogel or the corporation. Robert Biggert also gave his consent to Shipman representing either Vogel or the corporation.

Shipman and Vogel again met on May 26, 1959. Shipman again reiterated that he was interested in representing the corporation, but that he would have to have an air-tight agreement with Vogel. It was

agreed that Vogel would send Shipman a letter putting the terms of the agreement in writing. Shipman felt that this written agreement was primarily an assurance that the corporation would back Vogel's employment of him on the terms discussed since there was some question as to the votes that might be required to bind the corporation. However, Shipman cautioned Vogel not to expect him to favor Vogel, but rather, he explained that he would consider the corporation as a going concern.

On May 28, Vogel sent a letter to Shipman as follows:

> "You are aware of the fact that there is a possibility this company may become involved in a legal controversy with the Executrix of the Koster Estate, or her appointed agent. As President I have the authority to engage you as our legal counsel and therefore I am asking you to represent this company.
>
> With respect to fees for services rendered, any payment to you will first have to be approved by our Board of Directors in accordance with our By-Laws. I hope you can see your way clear to represent us on this basis."

However, due to an intervening holiday weekend, this letter was not received by Shipman until the following week.

On June 1, 1959, Vogel telephoned Shipman and told him that he had been trying to contact Paul Annes. Vogel explained that he had decided that if he could obtain the minority stock, then he would not have to worry about the outcome of plaintiff's declaratory judgment action. Shipman counseled that it would be inadvisable to stop defending the pending suit, but he did say that he thought the minority stock could be obtained. However, he told Vogel that before he could approach any stockholders, he would have to clearly explain to each of them his prospective employment as attorney for the corporation. He wanted each to exercise an independent judgment regarding the sale of the stock.

Although the time sequence is not exactly clear, it appears that the Vogel-Shipman telephone call of June 1 preceded Shipman's receipt of Vogel's letter of May 28. In any event, Shipman did not receive the letter until June 1 or a few days later. They met to discuss the letter a few days thereafter. Shipman complained that the original letter was too vague, and after some discussion, a postscript was added to the letter and independently signed by Vogel. It read as follows:

> "Upon my obtaining a majority of the outstanding Common A and Preferred shares, I shall see to it that you are retained as general counsel of the company for life at a total minimum retainer of $3,000.00 per year payable annually each year for fifteen

years: Provided, however, that the annual payments shall be increased by an amount equal to one per cent of the excess over $300,000.00 of the net sales of the company as shown on the balance sheet of the company for the preceding fiscal year, net sales to be calculated as they have been on the balance sheet for 1958. In the event you do not survive the full fifteen years, the balance of such payments shall be paid when they become due as you may by will direct or, in the absence of such direction, to your widow."

It must be emphasized that the record evidences no small confusion as to exactly when the postscript was added.

Apparently, there was another discussion on June 4, 1959, because on that date, Vogel sent another letter to Shipman which, in pertinent part, provided as follows:

"Per our discussion this afternoon I wish to make a proposal for the purchase of the following shares * * *."

He then offered $6000 for each of the four blocks of stock. He concluded by asking Shipman to communicate this offer to the people involved.

Consequently, on June 5, 1959, Shipman sent a letter to Paul Annes. In it, he enclosed a copy of Vogel's offer of $6000 for each block of stock. He continued:

"Although normally I would make a recommendation, I do not want to do so in this instance because I have been retained as counsel for the company, and [Vogel] has agreed to pay me a substantial retainer upon obtaining a majority of the shares of preferred and common A."

Shipman sent copies of this letter to all the persons involved, stating that since he could not make a recommendation, he felt that each of the others would be interested in Annes' decision.

On June 10, Annes wrote to Shipman accepting the offer of $7000 and suggesting that the others be informed of his decision.

The retainer agreement covered in the postscript to Vogel's letter of May 28, 1959, was formalized in an agreement dated June 15, 1959, which was signed by Vogel as president of the corporation and by Shipman. The agreement provided that Shipman was to be general counsel for life, that he was to be paid an annual retainer fee of $3000 per year plus a percentage of the corporation's sales, that the payments were to be made for a least 15 years notwithstanding that Shipman might die or become incompetent, and that Shipman was to be given considerable authority over the legal affairs of the corporation. In a separate document, the agreement was personally guaranteed by Vogel. Although no

percentage of the corporation's profits was ever paid, Shipman was paid the $3000 retainer for each of the next ten years. When this document was actually signed is unclear from the record.

On June 15, 1959, Shipman called Biggert and explained the current developments. Shipman would not urge him to do anything, but suggested he call Annes since Annes could view the matter disinterestedly. Biggert later called back and said that the trust officer had agreed to sell for $7000.

On June 17, a trust officer for the Biggert shares called Shipman and inquired about the terms of the sale. Shipman responded that the bank should make its own independent judgment, or consult with Annes because he (Shipman) was technically not disinterested.

On June 24, Vogel telephoned Shipman and informed him that he had received a letter from Albert Robbins, representing Janet Epstein, saying that whatever Annes had decided regarding the sale was okay with Epstein.

As to his services for the corporation, Shipman testified that during his almost ten years as counsel for the corporation, he spent at least 1500 hours of time on the affairs of the corporation. He testified that he prepared all the corporate documents with the exception of patent applications, that he attended the directors' and shareholders' meetings, that he gave advice in connection with legal questions that came to him as attorney, that he was involved in the matters arising out of an embezzlement of the corporation by an employee, and that he answered any and all requests of employees, officers and directors relative to legal questions concerning the corporation.

Finally, it should be noted that after purchasing the stock, Vogel had the stock registered in the name of George Pickard, his brother-in-law, as his nominee, rather than have his own name carried on the corporate books. Vogel testified that he did so in order to avoid a claim that those shares were also involved in the declaratory judgment action previously filed by plaintiff. The record is conflicting as to when plaintiff finally learned that Vogel was the legal owner of the stock.

Plaintiff argues that the corporate bylaws did not authorize Vogel to unilaterally bind the corporation to the terms of the retainer agreement with Shipman. Both the master and trial court agreed.

■■ There seems to be no real dispute that Vogel could not unilaterally obligate the corporation to pay Shipman $3000 per year. Nor could Vogel hire Shipman for life with a minimum term of employment for 15 years. The corporate bylaws require the consent of all five directors to authorize such actions. Moreover, the record clearly indicates that

Vogel knew he could not personally bind the corporation. At one point during cross-examination, he specifically admitted having no authority to enter into the agreement on behalf of the corporation. His letter to Shipman on May 28 also acknowledged the fact that such an agreement would require the approval of the Board of Directors. It is undisputed that the agreement was never submitted to the board for their approval. We conclude that both the master and chancellor properly found that the corporate payments made to Shipman by Vogel pursuant to the retainer agreement was a misapplication of corporate funds. As such, Vogel is liable to the corporation for their full amount. *Frankland v. Johnson*, 147 Ill. 520, 35 N.E. 480; *Vulcan Corp. v. Cobden Machine Works*, 336 Ill.App. 394, 84 N.E.2d 173; *Highway Insurance Co. v. Korman*, 40 Ill.App.2d 439, 190 N.E.2d 124.

Although both the master and the trial court agreed that Vogel was primarily liable for the full amount of money paid by the corporation to Shipman, they differed on whether to allow Vogel a setoff of the reasonable value of the services he could prove Shipman rendered to the corporation. In effect, the master attempted to balance the equities. The master recognized that although Vogel could not lawfully bind the corporation, Shipman did render legal services to the corporation for almost ten years. The master acknowledged the fact that during the first few months of the retainer agreement, Shipman performed more work for Vogel than for the corporation. However, the fact remained that over the course of the next nine years, Shipman allegedly rendered approximately 1500 hours of services to the corporation. The trial court's decree ignored Shipman's services to the corporation and made no provision for a setoff for those services. In this court, both parties, without pertinent citation of authority, argue the equities presented by the testimony.

Although it is undisputed that Shipman did perform legal services for Vogel, those services were performed during the initial months of the retainer agreement. After Vogel had completed acquiring the minority stock, the only work performed by Shipman that is disclosed by the present record was rendered on behalf of the corporation. While plaintiff challenges Shipman's statement that he rendered approximately 1500 hours of services to the corporation, plaintiff presented no evidence to the contrary, and the master found Shipman's testimony sufficiently credible to warrant further hearings.

■■ On the basis of the present record, we cannot say that the master's decision to balance the equities was unwarranted. The record is clear that Shipman rendered some legal services to the corporation. As such,

the mere fact that his employment contract was unauthorized would not preclude a recovery from the corporation on a *quantum meruit* basis. (*Warren v. Inter State Realty Co.*, 192 Ill.App. 438.) The corporation cannot justifiably complain of such a result. For over the course of nine years, it accepted, without question, the benefit of the contract. Indeed, the services rendered by Shipman were of a highly visible nature. Shipman attended corporate meetings, drew up contracts and agreements, and answered all legal questions for the directors, officers and employees. Since the corporation did not complain then, it cannot complain now. See *George F. Mueller & Sons, Inc. v. Northern Illinois Gas Co.*, 12 Ill.App.3d 362, 299 N.E.2d 601; *Builders Homes of Georgia, Inc. v. Wallace Pump & Supply Co.* (1973), 128 Ga. App. 779, 197 S.E.2d 839.

We emphasize that this determination is not meant to imply that the retainer agreement, as such, is enforceable against the corporation. We hold only that on a *quantum meruit* basis, Vogel should be given an opportunity to submit evidence to substantiate and prove up the details of the services Shipman rendered to the corporation and that Vogel be given credit for the reasonable value of such services.

We now turn to the effect of the retainer agreement on Vogel's acquisition of the minority stock. Plaintiff argues that the retainer agreement was given to Shipman by Vogel so that Shipman would help Vogel acquire the minority stock and that Vogel acquired the minority stock only because of Shipman's aid. Plaintiff notes that to pay corporate money pursuant to that agreement was a breach of the fiduciary duty Vogel owed to the corporation. Plaintiff concludes that because corporate money was improperly used to acquire the stock, the corporation should be declared the owner of the stock.

The short answer to plaintiff's contention is that the master found, and we agree, that the retainer agreement was not instrumental in Vogel's acquisition of the minority stock. Plaintiff emphasizes that Vogel negotiated Shipman's retainer agreement at the same time that he was negotiating to purchase the minority stock and that the postscript added to Vogel's letter of May 28 indicates that the retainer agreement was conditional on Vogel's acquisition of the minority stock. Plaintiff also notes the "coincidence" that it was Shipman who originally brought into the corporation the same individuals Vogel later bought out. However, plaintiff overlooks the fact that the minority group had expressed a desire to sell to Vogel long before there was any mention of a retainer agreement and that Vogel knew of their interest to sell. More importantly, plaintiff ignores the several instances where Shipman, based

148

on his own possible bias to a future sale, expressly requested the minority group to obtain independent advice.

Paul Annes was, himself, a lawyer. He testified that he was the one to first mention a possible sale of the stock shortly after Koster's death. His testimony, taken as a whole, reflects a careful decision to sell based on his own independent analysis of the facts and figures before him. It cannot be over emphasized that Koster's death had had a profound effect on all the minority shareholders. In Koster's death, the corporation lost its most experienced and capable designer and manager. Without Koster, the corporation's future outlook was, to say the least uncertain. In these business matters, Annes felt at least equal to most people he knew, including Shipman. This cautious attitude expressed by Annes, combined with Shipman's express disclaimers of advice, lead to but one conclusion: Annes decided to sell his wife's stock completely independent of any pressure applied by Shipman. It should also be noted that it was this decision by Annes, not pressure or advice from Shipman, that influenced the rest of the minority group.

Mr. Biggert was employed by a large corporation. As early as June 1958, Biggert expressed his doubts about the continuing profitability of the corporation. Moreover, Biggert had the advice of the trust department of two different banks. There is no evidence that Biggert's decision to sell his stock was influenced in any way by Shipman.

Janet Epstein relied on the advice of a Mr. Robbins, another attorney, and Mr. Annes. A fair summary of the evidence regarding Janet Epstein's decision to sell would indicate that she and Robbins relied substantially on the decision of Mr. Annes to sell. There was again no evidence to indicate that Shipman pressured Janet Epstein or Mr. Robbins to sell to Vogel.

■■ It is clear that the minority stockholders were knowledgeable people who received counselling on the advisability of selling their shares independent of Shipman. The testimony shows that the minority stockholders made what they considered intelligent and accurate evaluations of the value of their stock, and it was on that basis, not pressure from Shipman, that they reached their decision to sell. We conclude that there was substantial evidence to support the master's finding that the retainer agreement was not instrumental in Vogel's acquisition of the minority stock.

■■ Having so decided, plaintiff's argument that corporate funds were used to make possible the acquisition of the minority stock must be rejected. The fact that Shipman helped Vogel in the mechanics of transferring the stock does not alter this result. For although Vogel's personal use of the corporate attorney was improper, it was not the cause

of Vogel's acquiring the minority stock. The wrongful application of corporate funds must be separated from the acquisition of the stock.

We have already determined that the availability of the minority stock was not a corporate opportunity, and as such, Vogel could properly acquire that stock without breaching any duty owed to the corporation or plaintiff. That acquisition does not become improper because a corporate attorney was used to effectuate the mechanics of the stock transfer. For instance, had Vogel used Shipman to close a real estate transaction, Vogel would be liable to the corporation for the time Shipman devoted to the transaction, but the real estate involved would remain the property of Vogel.

In the instant case, Shipman merely inquired whether the minority group would sell to Vogel. He exerted no pressure and proffered no advice. The minority group independently decided to accept the offer. Vogel used his own money to make the purchases. We can discern no legal theory by which the corporation obtained any legal rights in the ultimate transaction.

We acknowledge that the retainer agreement was indeed unusual in its one-sidedness. Plaintiff suggests that it was written to insure Shipman's cooperation in obtaining the minority stock. Vogel testified that he was certain that Melish was about to ruin the corporation through interference and lawsuits. He felt that it was absolutely necessary to engage a competent attorney who was familiar with the problems of the corporation, and because he thought Shipman could render that assistance, he gave scant attention to the details of the agreement. Shipman testified that he wanted an "air-tight" agreement based on his past disappointments with the corporation's performance. Both parties draw innumerable inferences from this voluminous record to support their respective positions.

■■ While certain irregularities appear and some of them may even be said to look suspicious, the entire question was one of fact. It was the master who heard and saw the witnesses. In spite of any possible inferences to the contrary which might be drawn from portions of the evidence, the evidence was sufficient to support the master's finding that the retainer agreement was not intended or used to acquire the minority stock. The trial court was in no better position than we are to resolve the conflicting testimony or to draw the permissible inferences. The master's determination will be upheld.

Accordingly, for the reasons given, that portion of the circuit court's order finding for plaintiff as to Count VI is reversed and remanded for proceedings not inconsistent with the views expressed herein.

## E.

■■ Defendant corporation and defendant Vogel filed a third-party complaint against Edward Melish requesting the court to permanently enjoin Melish from threatening or harassing the corporation or its employees and from entering upon the corporate premises.

The complaint was essentially based on two incidents: the alleged bombing of Vogel's home and the alleged firing of rifle shots through a window of Shipman's home.

Both the master and trial court found no evidence to connect Melish to the alleged incidents and accordingly dismissed the complaint.

Suffice it to say that we have examined the record and agree that there was no evidence presented to warrant an injunction.

Accordingly, that portion of the circuit court's order dismissing the third-party complaint is affirmed.

Judgment affirmed in part; judgment reversed in part; judgment reversed and remanded in part.

DOWNING, P. J., and LEIGHTON, J., concur.